IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA )
                         )
    v.                   )      1:05CR247
                         )
RANDELL TOBIAS GRADY     )

MEMORANDUM OPINION AND ORDER

OSTEEN, District Judge

Defendant Randell Tobias Grady was arrested after a search of his van revealed that he was in possession of illegal drugs. The search was conducted after a narcotic detection dog alerted to the odor of narcotics during a scan of Grady's vehicle; the scan took place while Grady was the subject of an investigatory detention. Grady seeks suppression of the drugs obtained during the search because his detention at the time of the drug dog's scan was unlawful.

I.   BACKGROUND

On December 16, 2005, Officer Larry Hubbard of the Police Department of the City of Concord, North Carolina, was working secondary employment at the Carolina Mall in Concord. In the weeks prior to that day, there had been reports of vehicles broken into or stolen in the mall parking lot, and Officer Hubbard was providing parking lot security. During his patrol, he received information that a mall patron had seen an individual

reach through the window of, open, and drive away in a van parked in the parking lot. Suspecting that the van might just have been stolen, Officer Hubbard identified the van as it left the parking lot and followed it. Officer Hubbard saw that the driver, Grady, was not wearing a seat belt. Officer Hubbard signaled for the van to pull over, and Grady moved the van to the left side of the road and stopped. Officer Hubbard reported by radio to a dispatcher that he had stopped a possible stolen vehicle, and he requested registration information based on the van's license plate number.

Officer Hubbard walked to the driver's side window and asked the driver for his license and registration.[1] Officer Hubbard then asked Grady to step out of the van and performed a pat-down search.[2] During the search, Officer Hubbard found a large, hard object inside Grady's jacket. Upon removing it, he determined that it was a large roll of cash. The volume and denominations of the bills led Officer Hubbard to suspect drug activity.[3]

---

[1] According to Officer Hubbard's testimony, Grady gave Officer Hubbard his driver's license but did not provide registration. In contrast, Grady testified that he did produce his registration. The relevance of the registration is discussed below.

[2] Officer Hubbard testified that Grady consented, while Grady testified that he did not. Regardless, Grady does not suggest that this search was improper.

[3] According to his testimony, Officer Hubbard's suspicion was based on (1) his observation of a large number of ten-dollar
(continued...)

2

Officer Hubbard asked Grady to sit in a marked patrol car belonging to another officer who had recently arrived.[4]

While Grady was in the car, Officer Hubbard made several radio and telephone calls. One of these was a call to Officer Anthony Atwell, requesting that Officer Atwell bring his narcotic detection dog to Officer Hubbard's location. At Officer Atwell's request, Officer Hubbard turned on the van's vent, rolled up the windows, and closed the door. Officer Hubbard observed that the van had no exterior door handles. Another of the calls made by Officer Hubbard was a general request for any information about Defendant Grady. He received responses from Officers Todd McGee, Javonne Clark, and Detective Daniel DeGrace. Officer McGee informed him that Grady was an active drug dealer. Officer Clark also stated that Grady was a prominent drug dealer; he told Officer Hubbard to check Grady's van for hidden compartments. Detective DeGrace told Officer Hubbard that Grady was the subject of an ongoing drug investigation; Detective DeGrace also indicated that he was nearby and would be coming to Officer Hubbard's location. In addition to these conversations, Officer

---

[3](...continued)
bills and twenty-dollar bills, and (2) his knowledge that crack cocaine is generally sold as ten- or twenty-dollar rocks.

[4] The testimony of Grady and that of Officer Hubbard are inconsistent with regard to the amount of time spent by Grady in particular vehicles and the sequence of vehicles in which he spent time. The timing and sequence are not material to the points at issue here.

3

Hubbard spoke with several other people in an attempt to learn more about Grady's drug activities.

Approximately fifteen minutes after initiating the stop, Officer Hubbard received a response from the dispatcher that confirmed that Grady was the owner of the van. He then moved Grady to a different patrol car, where he began to issue a citation for failure to wear a seat belt.[5] Before Officer Hubbard finished issuing the citation, Officer Atwell arrived and had his dog scan the exterior of Grady's van; the scan resulted in the dog alerting to the odor of narcotics. The period of time from the initial traffic stop to the scan by the narcotics detection dog was approximately thirty minutes.

After the dog alerted, the officers present attempted to enter the van in order to search it. After some initial difficulty, they gained access. Inside the van, the dog alerted on a black fanny pack containing crack and powder cocaine, and Grady was subsequently arrested.

## II. ANALYSIS

The primary issue raised in Grady's motion is whether evidence obtained during the search of his van should be

---

[5] In his testimony, Grady denied that he had learned that he was to be cited for a seat belt violation until he was taken to the police station. This testimony is not directly in conflict with Officer Hubbard's statement that he had begun to issue the citation, since he may have been filling out paper work rather than talking with Grady about the citation. The relevance of whether the citation was actually issued is discussed below.

4

suppressed on the grounds that his detention at the time of the drug dog scan was unlawful. A secondary issue, which arose during the hearing held by the court, is whether certain questions asked of Grady during cross-examination were appropriate under Federal Rule of Evidence 104(d). The court will address the second matter first.

    A.    Permissibility of Questions Asked During the Suppression Hearing

During cross-examination of Grady at the suppression hearing, he was asked several questions regarding his ownership of the drugs discovered in his van. Grady contends these questions were unrelated to the issue in the hearing, i.e., whether Officer Hubbard was justified in detaining him at the time the drug dog scanned his van, and thus impermissible under Federal Rule of Evidence 104(d).[6] The Government contends that it asked the questions only for the purposes of impeaching Grady's credibility and they were, therefore, permissible. In deciding this motion, the court has not considered any testimony relating to Grady's ownership of the drugs found in his van or events that took place after the search was completed. The court expresses no opinion about whether Rule 104(d) has implications for the admissibility of the testimony in any other context.

---

[6] Rule 104(d) states: "The accused does not, by testifying upon a preliminary matter, become subject to cross-examination as to other issues in the case."

5

B. Suppression of Evidence

Grady seeks the suppression of any evidence obtained from the search of his van on the grounds the search took place while he was unlawfully detained. To evaluate the lawfulness of Grady's detention, the court must determine whether Officer Hubbard had sufficient reason for detaining him at the time the scan took place. Although Grady does not claim that Officer Hubbard acted unlawfully in detaining him for the purpose of the traffic stop, he asserts that he was detained beyond the time necessary for the purposes of the stop. In opposition, the Government denies the detention was unnecessarily long. Additionally, the Government argues the length of the stop did not need to be related to a limited, original purpose; instead, there were independent grounds for Grady's arrest that justified detaining him for the period in question. For the reasons stated below, the court concludes that Grady's detention was not impermissibly prolonged; however, the court declines to adopt the Government's reasoning regarding the independent reasons for arrest.

1. Length of Detention

Grady's detention for the thirty-minute period leading up to the drug dog scan was lawful because Officer Hubbard had reasonable suspicion that Grady was involved in criminal activity. Temporary detention of an individual during the stop

6

of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a seizure of a person within the meaning of the Fourth Amendment of the U.S. Constitution. Delaware v. Prouse, 440 U.S. 648, 653, 99 S. Ct. 1391, 1396 (1979). The constitutionality of such a stop is analyzed according to Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868 (1968). The court must first determine whether the officer was justified in making the stop and then determine whether the officer's actions during the stop were reasonably related to the circumstances which justified the stop. See United States v. Rusher, 966 F.2d 868, 875 (4th Cir. 1992) (applying Terry to a traffic stop).

Regarding whether a stop is justified, a brief investigatory stop must be supported by reasonable suspicion that criminal activity is taking place. United States v. Foreman, 369 F.3d 776, 781 (4th Cir. 2004) (citing Terry, 392 U.S. at 30, 88 S. Ct. at 1868). An evaluation of reasonable suspicion involves a common sense, nontechnical determination. Id. It is less demanding than probable cause, but it "does require 'a minimal level of objective justification' for the police action." Id. (quoting Wardlow v. Illinois, 528 U.S. 119, 123, 120 S. Ct. 673, 675-76 (2000)).

Regarding the scope of a stop, during a routine traffic stop, an officer may request a driver's license and vehicle

7

registration, run a computer check, and issue a citation. Id. at 876-77. Any further investigative detention is beyond the scope of the Terry stop and, therefore, unlawful unless the officer has a reasonable suspicion of other criminal activity. Id. When a stopped vehicle is subjected to a drug dog scan, the scan itself requires no particular justification because it is not a search. United States v. Place, 462 U.S. 696, 706-07, 103 S. Ct. 2637, 2644-45 (1983). Nonetheless, the officer must have reasonable suspicion to justify the seizure of the vehicle for the period in which the scan takes place. United States v. McFarley, 991 F.2d 1188, 1191 (4th Cir. 1993).

Grady challenges the search of his van on the grounds that Officer Hubbard exceeded the scope of the detention allowed by the purpose of the stop. Specifically, he claims that thirty minutes was more time than Officer Hubbard needed to resolve an investigation into whether the van was stolen and to issue a citation for a seat belt violation. He asserts that Officer Hubbard ceased to pursue either of the two original purposes and detained him for the sole purpose of investigating drug activity, and that the facts available to Officer Hubbard were insufficient to justify a temporary seizure for that purpose.

The court concludes that, taken together, the investigation and citation justified the thirty-minute stop. When a stop is not made for the purposes of a routine traffic violation, but as

8

part of an investigation of separate criminal activity, the officer may be justified in detaining the driver past the point that would be appropriate for a routine traffic violation. See United States v. Singh, 363 F.3d 347, 355-57 (4th Cir. 2004). Here, the stop of the van had two purposes, and Officer Hubbard pursued them sequentially. He waited approximately fifteen minutes to confirm the van was not stolen. As soon as he received that confirmation, he began the process of issuing the citation. Although, under other circumstances, the seat belt citation might have been issued more quickly, the theft investigation justified the detention of Grady until Officer Hubbard received confirmation from the dispatcher that the van was registered in Grady's name.[7]

To challenge this conclusion, Grady asserts that he provided Officer Hubbard with his registration card, and he contends that his registration card eliminated any reasonable suspicion that he had stolen the van. Whether or not Grady had his registration card with him is a fact on which the parties disagree. Certainly, if Grady did not provide his registration card, Officer Hubbard was justified in detaining him further. Even

---

[7] Grady contends that Officer Hubbard's claim that he requested a report on the license plate is not credible because it was not listed on an event report from the City of Concord relating to the stop. Grady does not, however, offer evidence from anyone knowledgeable about the preparation of event reports regarding whether a call should have been listed. The court accepts Officer Hubbard's testimony that the call was made.

9

assuming that Grady did provide the card to Officer Hubbard, the court concludes that further detention was justified. Grady claims that, once the registration card had been produced, Officer Hubbard had enough information to determine that the van had not been stolen; therefore, at that point, Officer Hubbard should have proceeded directly to issuing the citation. The court agrees that Officer Hubbard could have concluded his investigation at that time, but it does not agree that he necessarily should have done so. There is no dispute that Officer Hubbard placed the call for a license plate report before he could have seen Grady's registration card. It was not irrational for him to wait for a response. Grady has not produced evidence that the Concord Police Department has a policy that investigations of this nature conclude when the driver produces a registration card or that such investigations usually do so. There is, however, evidence that the issue was not resolved in the mind of Officer Hubbard at a time after the registration card was said to have been produced.[8]

As stated above, an officer engaged in a routine traffic stop may await the results of a computer check on a driver's license and registration. A license plate inquiry is analogous

---

[8] According to Grady's testimony, he gave Officer Hubbard his registration card shortly after he had been stopped but, some time later, Officer Hubbard asked him if the van was registered in his name.

to a computer check to the extent that it allows the officer to
compare the information gathered from a driver with information
from a centralized database.  If the inquiry takes longer than a
computer check, the additional delay is balanced by the greater
severity of the crime being investigated.  Thus, the court
concludes that Grady's detention was not unreasonably long, given
the purposes for which he was stopped.

Nonetheless, this conclusion does not fully answer Grady's
challenge.  He contends not only that the detention was
unreasonably long but also that Officer Hubbard actually
abandoned the purposes of the stop and began investigating
potential drug activities.  According to Grady's characterization
of the facts, fifteen minutes into the stop, Officer Hubbard knew
that the van belonged to Grady.  He had, by then, had time to
issue a citation, but Grady was detained an additional fifteen
minutes.  Furthermore, according to Grady's testimony, while at
the scene of the stop, he was not given a citation for any
infraction, which supports an allegation that Officer Hubbard was
detaining him for another purpose.  He calls the court's
attention to <u>United States v. Jeffus</u>, 22 F.3d 554, 557 (4th Cir.
1994), in which the Fourth Circuit considered a traffic stop that
culminated in a drug dog scan.  In upholding the scan, the Court
of Appeals placed emphasis on the fact that "the entire time
before the [challenged drug dog scan] was occupied with traffic

11

stop procedures." Id.  Grady claims that, here, the time prior to his scan was not occupied with traffic stop procedures but with calls by Officer Hubbard to various other officers, made in an attempt to discover information about Grady, a purpose that would not justify the detention.

The court agrees that Officer Hubbard was not free to postpone indefinitely the issuance of the seat belt citation for the purpose of engaging in other business.  Nonetheless, Jeffus is not helpful to Grady because, in that case, the drug dog scan was motivated by conversations the officer had with the stopped driver on matters unrelated to the stop.  Id.  The conversations took place while the officer was waiting for the results of a computer check of the driver's license.  Id.  Similarly, the fact that Officer Hubbard engaged in other business during Grady's detention does not make the detention improper, since he was then waiting for the results of the license plate report, which was part of the reason for the stop.

Even were the court to conclude that the purposes of the stop only justified holding Grady until Officer Hubbard received the license plate report, Officer Hubbard's actions would still be permissible.  During a traffic stop, circumstances may arise that create reasonable suspicion of additional criminal activity and thus justify the detention of an individual after the purpose of the stop is concluded.  See, e.g., Foreman, 369 F.3d at 782-84

12

(holding that suspicious behavior by an individual during a traffic stop justified his further detention after he had been given a warning for traffic violations). Here, as Officer Hubbard interacted with Grady during the traffic stop, circumstances developed in a way that created reasonable suspicion that Grady was involved in drug activity.

Within the first few minutes of the stop, as he was proceeding with the investigation of the stolen vehicle, Officer Hubbard discovered that Grady was in possession of a large roll of cash of particular denominations, which, in Officer Hubbard's experience, suggested participation in drug sales. Shortly thereafter, Officer Hubbard learned from several other officers that Grady was known to engage in the sale of large quantities of drugs. Officer Clark had independent knowledge about the van Grady was driving and suspected that it might have hidden compartments. Detective DeGrace informed him that Grady was under investigation and that DeGrace would be coming immediately to speak to Grady. Detective DeGrace, in turn, knew that a confidential informant had, approximately forty-five minutes before the traffic stop, arranged to purchase cocaine from Grady. Although Detective DeGrace did not inform Officer Hubbard of this fact, Detective DeGrace implied that Officer Hubbard should detain Grady until Detective DeGrace arrived.

13

When combined with the information available to Detective DeGrace and the implied instruction, the information available to Officer Hubbard was sufficient to create a reasonable suspicion that Grady was carrying illegal drugs. Even if Officer Hubbard were not actively pursuing either the seat belt citation or the possible theft during the first fifteen minutes of the stop, the seizure was justified long enough for Officer Hubbard to gain new information that justified the detention of Grady until the drug dog arrived.

    2. Independent Grounds for Arrest

The Government suggests that Grady's detention should be considered without regard to the reasons justifying the traffic stop. Rather, the Government asserts that Officer Hubbard had probable cause to arrest Grady for the commission of three misdemeanors:[9] (1) the operation of a vehicle with illegally tinted windows (a misdemeanor under N.C. Gen. Stat. §§ 20-127(d)(2) & -176(c)), (2) failure to move his vehicle to the right side of the road when approached by a law enforcement vehicle with activated lights and an audible signal (a misdemeanor under N.C. Gen. Stat. § 20-157(a)), and (3) operation of a vehicle on a highway without carrying the vehicle's

---

[9] In North Carolina, "[a]n officer may arrest without a warrant any person who the officer has probable cause to believe has committed a criminal offense in the officer's presence." N.C. Gen. Stat. § 15A-401(b)(1).

14

registration card (a misdemeanor under N.C. Gen. Stat. § 105-449.51). Furthermore, the Government cites <u>United States v. Singh</u>, 363 F.3d 347, 354 (4th Cir. 2004), and <u>United States v. Gray</u>, 137 F.3d 765, 770 (4th Cir. 1998), for the proposition that, in determining the existence of probable cause, the court should apply an objective test rather than looking at the officer's subjective motivations for an arrest. From this, the Government concludes that it does not matter whether Officer Hubbard knew that he had probable cause to arrest; if, objectively, he did have probable cause, he was entitled to detain Grady.

    The Government is correct in disregarding subjective intent in the determination of the existence of probable cause. Instead, the court must "assess the relevant facts known to the authorities and decide whether those facts, 'from the standpoint of an objectively reasonable police officer,' give rise to reasonable suspicion or probable cause." <u>Singh</u>, 363 F.3d at 354 (quoting <u>Ornelas v. United States</u>, 517 U.S. 690, 696, 116 S. Ct. 1657, 1661-62 (1996)). Importantly, the set of facts the court considers is that set of facts "known to the authorities." Regarding the set of facts known to Officer Hubbard, the Government acknowledges that he did not know of the illegality of the tint on Grady's windows. Even as to the other two misdemeanors, there is no evidence that Officer Hubbard was

15

aware, at the time of the stop, of the fact that they were grounds for arresting Grady. If Officer Hubbard were unaware of that fact, it should not be considered in the probable cause analysis.

For this reason, the court declines to hold that the independent misdemeanors justified Grady's detention. In light of the court's conclusion that the detention was otherwise justified, such a holding is unnecessary.

### III. CONCLUSION

The detention of Defendant Grady from the time he was stopped by Officer Hubbard to the time the drug dog alerted on Grady's van was not unlawful. Officer Hubbard had reasonable suspicion of a traffic violation and of the theft of the van to justify detaining Grady until a citation was issued and the investigation was concluded — a time period that, by itself, was long enough to include the scan. Additionally, circumstances arose during the lawful detention period that created reasonable suspicion that Grady was involved in criminal drug activity, justifying his further detention until the drug dog completed the scan. For the foregoing reasons, the court concludes that Grady's Motion to Suppress Evidence should be denied.

IT IS THEREFORE ORDERED that Defendant's Motion to Suppress [17] is denied.

This the 24th day of October 2005.

_____
United States District Judge